953 So.2d 1025 (2007)
C.L.S.
v.
G.J.S.
C.L.S.
v.
G.J.S.
Nos. 2005-CA-1419, 2005-CA-1420.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 2007.
Rehearing Denied May 2, 2007.
*1026 Richard L. Ducote, Richard Ducote & Associates, P.L.C., Metairie, Louisiana, and Erica Nicole Burns, Richard Ducote & Associates, P.L.C., Pittsburgh, PA, for Plaintiff/Appellee, C.L.S.
Robert D. Levenstein, Law Offices of Robert D. Levenstein, LaPlace, LA, for Defendant/Appellant, G.J.S.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY, Judge DENNIS R. BAGNERIS, Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO, Jr.).
LEON A. CANNIZZARO, Jr., Judge.
The trial court entered a judgment awarding C.L.S. (the "Mother") sole custody of her daughter, A.S. (the "Daughter")[1]. The Daughter's father, G.J.S. (the "Father"), is appealing the judgment. For the reasons set forth below, we affirm the trial court judgment.

FACTS AND PROCEDURAL HISTORY
The Mother originally filed a petition for child custody and support when the Daughter was less than five months old. A consent judgment was signed almost eleven months later awarding to the Mother custody of the Daughter subject to the Father's visitation privileges. The Father filed a rule to clarify the consent judgment and to expand his visitation rights or to change the custody of the Daughter. Another *1027 consent judgment was signed when the Daughter was almost four years old. In that consent judgment the Mother was designated as the domiciliary parent and the primary physical custodian, and the Father was granted reasonable visitation and communication with the Daughter.
When the Daughter was approximately six years old, two complaints were lodged with the Office of Community Services in the Louisiana Department of Social Services (the "OCS"). The complaints alleged that the Daughter had been sexually abused. The claims were investigated, and both claims were ultimately determined by the OCS to be invalid.
The Mother then filed a petition requesting relief under the Post-Separation Family Violence Relief Act, La. R.S. 9:361 et. seq. (the "Violence Relief Act"), from sexual abuse that was allegedly perpetrated on the Daughter by her father. An abuse prevention order was issued, and the Father then filed a rule to change the Daughter's custody and a rule for contempt.
The Mother's request for a protective order and the Father's rules for change of custody and contempt were set for hearing, and a hearing before Judge Paulette Irons was held. On the second day of the hearing, however, Judge Irons transferred the case to the division of court that had originally handled the custody proceedings involving the Daughter. A month later the Father filed motions for the appointment of a guardian ad litem and an independent child psychologist for the Daughter, for a review of the original transcript of the proceeding before Judge Irons, and for an expedited hearing.
Less than a month after the Father filed the motion for an expedited hearing, all the parties' motions were tried before Judge Sidney H. Cates, IV, who considered de novo the Mother's petition for a domestic violence restraining order under the Violence Relief Act and the Father's rules for custody and contempt as well as the other motions that had been filed by the Father. A number of witnesses testified at the trial, and the transcript of the earlier hearing before Judge Irons was introduced into evidence.
Testimony of the Mother's Friends Who Babysat with The Daughter
K.S.
K.S. ("Babysitter One") testified that she and the Mother were "long-time friends." She further said the Daughter and her daughter, G. ("Playmate One"), were friends. Babysitter One had babysat for the Daughter "many times" from the time that the Daughter was approximately a year old. She babysat for the Daughter for "about four years" while the Mother attended classes for a degree that she was pursuing. Babysitter One babysat once a week during most of that time, but she babysat twice a week during one semester. She occasionally babysat on weekends, also.
Babysitter One testified that when the Daughter was about four years old, she started to change dramatically. Whereas she was previously a "very active child, very lithe, very strong and active, very happy and energetic . . . just a sweet little girl," she became "very aggressive" and "very sexual in a disturbing way." At least once or twice a week the Daughter tried to choke Babysitter One, and the Daughter would laugh while she was doing so.
According to Babysitter One, once when the Daughter was choking her, she told the Daughter that being choked hurt, and she asked the Daughter whether anyone had ever choked her. The Daughter replied, "My daddy chokes me, and that's why I choke grownups." The Daughter also related that once when her father was *1028 choking her, she was under the table kicking him, and "his pants fell down."
Babysitter One further testified that the Daughter became very hostile toward Playmate One, Babysitter One's daughter. Babysitter One said that the Daughter "cracked her [Playmate One's] back on the table," and gave Playmate One "goose eggs on her head," and then laughed when Playmate One cried.
Babysitter One began to notice that the Daughter talked about "sexy boys and sexy girls" when the Daughter was around four years old. The Daughter subsequently began talking about penises and vaginas. The Daughter said that boys have "big, gross penises." Additionally, Babysitter One observed the Daughter demonstrating what "looked to me like a man holding his penis and thrusting it." The Daughter said, "Men have big, gross penises, and they do this." The Daughter also began to grope Babysitter One, reaching under Babysitter One's skirt. The Daughter did the same to Playmate One, sticking her fingers inside Playmate One's shorts, trying to reach her underwear.
Babysitter One testified that when she related her concerns about the Daughter's behavior to the Mother, the Mother was obviously concerned but "seemed overwhelmed." When Babysitter One told the Mother about some of the sexual behavior that the Daughter was exhibiting, Babysitter One said that the Mother "thought it was just sort of a natural interest in sex." After a telephone call from the Father relating an incident that had occurred while the Daughter was visiting with him, the Mother became very concerned. The Father had told the Mother that while the Daughter was visiting with him and playing with another child, the Daughter had put a crayon into the child's vagina. The Father had spanked the Daughter for doing this.
When Babysitter One suggested to the Mother that the Father might have abused the Daughter, the Mother said that although the Father had been abusive to her, she did not think that he would ever abuse the Daughter. In fact, Babysitter One testified that the Mother was very disturbed by the idea that the Father could have abused the Daughter and insisted that he could not have done so.
On one occasion Babysitter One and Playmate One were visiting the Mother and the Daughter after the Daughter had been visiting with her father earlier in the day. During their visit, Babysitter One and the Mother bathed their children. The Daughter was crying, and the Mother asked Babysitter One to look at the Daughter's vagina, which was excoriated. The Mother said, "He doesn't even know how to wipe her properly." Babysitter One testified that the Mother attributed the rawness and soreness to the Father's failure to take proper hygienic care of the Daughter.
One day when Babysitter One was babysitting with the Daughter, the Daughter and Playmate One were taking a bath together. Babysitter One left the bathroom briefly, and when she returned, "[the Daughter] was sort of on top of . . . [Playmate One] with her legs spread and her face sort of down between . . . [Playmate One's] legs." Playmate One then reported to her mother that the Daughter "was looking at my bottom, and she was touching my bottom." Playmate One was upset by the Daughter's behavior, and Playmate One told her mother that the Daughter had said "Shush, don't tell anybody this."
After the incident that occurred in the bathtub, Babysitter One told the Mother that she could not baby-sit for the Daughter anymore, because Babysitter One was *1029 concerned about her own daughter's well being. Babysitter One testified that although the Mother was "in denial" about what had happened, Babysitter One believed that "[t]here was something desperately wrong with the Daughter."
For a period of several months, Babysitter One and the Mother did not have contact with each other, but they ultimately began letting their daughters play together again. Babysitter One insisted that the girls could not be in a room alone, however.
Babysitter One moved from New Orleans to Pittsburgh, but she returned to New Orleans to visit a few months after a court order had been issued that prevented the Daughter from visiting with the Father. Babysitter One saw the Daughter while she was visiting New Orleans, and she testified that the Daughter's behavior had changed. The Daughter "seemed to be a different child." She seemed younger, gentler, and she did not exhibit any violence. Nevertheless, the Daughter still made "sexual comments and other disturbing comments . . . during our visitation. . . ."
P.G.
P.G. ("Babysitter Two"), who was the Mother's friend, also babysat with the Daughter. Babysitter Two had testified at the earlier hearing before Judge Irons, and her testimony was admitted into evidence at the trial before Judge Cates. In her testimony, Babysitter Two said that she had known the Mother for eight or nine years and that she had started babysitting with the Daughter once a week beginning about nine months before the trial. She also babysat with the Daughter periodically on the weekends. Babysitter Two said that prior to her babysitting with the Daughter, she saw the Daughter and the Mother approximately two or three times a month.
Babysitter Two testified that during the year prior to the trial, she had observed a change in the Daughter's behavior. She said that the Daughter was "much more hyper," that she was "a little bit combative," and that she "seemed agitated a great deal of the time." Babysitter Two also observed that the Daughter had "very adult-like female movements in her dance" and that the Daughter's behavior was "sexual in nature, rubbing herself and singing." Babysitter Two heard her sing, "Look at my bootie, I have a beautiful bootie, don't you want to touch my bootie, boys like bootie." On three or four occasions Babysitter Two saw the Daughter masturbating while she was lying on a sofa watching cartoons.
Babysitter Two further testified that on one occasion the Daughter "described that this boy in particular, Jared, threw her on a mattress and that he put fingers in places and touched her and touched her [sic] and touched other friends of hers and locked her in a room where she couldn't get out and she was very afraid." Babysitter Two stated that the Daughter talked non-stop for about an hour when she had told Babysitter Two about Jared. The Daughter also mentioned a tree house in connection with the events concerning Jared.
While the Daughter was talking to Babysitter Two about Jared, the Daughter "was shaking uncontrollably and kept saying over and over about this incident being thrown down on a mattress and fingers being put places and boys taking their hot dog . . . [t]hat boys would take their hot dog and do this and put juice all over her; and that this boy slobbered all over her and she didn't like it." When she was talking about the "hot dog," the Daughter was simulating "a man masturbating." Babysitter Two testified that while the Daughter was describing the "hot dog" *1030 incident, she was "rocking in the chair writhing and pushing herself back, getting very stiff and trembling all over." When the Mother came to get the Daughter, Babysitter Two told her what the Daughter had said. Babysitter Two testified that when the Mother learned of the Daughter's revelations, she was "distraught."
According to Babysitter Two's testimony, after the Daughter had begun therapy and had been examined by physicians, the Daughter expressed to Babysitter Two on "numerous occasions" that she was afraid that her father would hurt her mother if she told anyone what her father had done to her. She also said that she was "afraid of telling what her daddy had done to her because he would go to jail." The Daughter told Babysitter Two that she was not going to tell the doctors what her father had done. Because of the Daughter's fear of talking to the doctors, Babysitter Two went with her to a therapy session. She and the Daughter, together with the Mother, met with Brenda Coleman, a social worker.[2]
Babysitter Two related to Ms. Coleman what the Daughter had told her. Babysitter Two also told Ms. Coleman that the Daughter would whisper in her ear what the Daughter had told her in private so that she, rather than the Daughter, could tell Ms. Coleman what the Daughter had said. Although the Daughter whispered in Babysitter Two's ear when they met with Ms. Coleman, the Daughter did not tell Babysitter Two what she had told her in private; she just whispered, "I have a secret."
Expert Witness Testimony
Brenda Roth Coleman, MSW
Brenda Roth Coleman, who was a clinical social worker in private practice, testified at the earlier trial before Judge Irons, and her testimony was introduced into evidence at the trial before Judge Cates. Ms. Coleman, who had earned a masters degree in social work and had been a social worker for a number of years, was accepted by the trial court as an expert in clinical social work.
Ms. Coleman testified that the Daughter was referred to her by the Daughter's pediatrician. The Mother told Ms. Coleman that she feared that the Daughter had been sexually abused by her father. The Mother related the Daughter's symptoms to Ms. Coleman. According to Ms. Coleman's testimony, the symptoms were "crying to sleep with the mother almost every night, wetting, soiling, occasionally [being] aggressive and combative with other children."
Ms. Coleman testified that she began a course of therapy with the Daughter. Ms. Coleman stated that she saw the Daughter a total of nine times and that she saw the Mother a total of five times. At one of their visits, Ms. Coleman said that she met with the Daughter, the Mother, and Babysitter Two. Ms. Coleman further testified that when she first started counseling the Daughter, the Daughter was approximately five years old.
Ms. Coleman described the Daughter as hyperactive, and she said that the Daughter "kept up a kind of rapid fire conversation." Ms. Coleman specifically testified that during the Daughter's visits, the Daughter would routinely choose to play with female dolls, who were not clothed but who were also not anatomically correct, and would "focus on the genitals, front and back." The Daughter would *1031 poke the dolls with a pencil and would say, "And you poke, you poke, in the behind." At one visit with Ms. Coleman, while the Daughter was playing with the naked dolls, she pointed to a naked doll's genital area and said, "You slabber [sic] on the front and you poke on the back." When Ms. Coleman asked the Daughter what she meant, the Daughter was evasive, saying that she forgot what she meant. Ms. Coleman also testified that the Daughter never wanted to play with the anatomically correct dolls who were always wearing diapers. Ms. Coleman found the Daughter's behavior with the dolls to be abnormal.
Ms. Coleman asked the Daughter about the Father on several occasions, and the Daughter said that he was nice and that his girlfriend was nice. The Daughter also told Ms. Coleman that "they might put my dad in jail," but the Daughter was evasive when she was asked why the Father might be put in jail.
Ms. Coleman testified that during the time that she was counseling the Daughter, the Mother had reported the Daughter's possible abuse to the OCS. The allegations of abuse were investigated but, according to Ms. Coleman's testimony, the matter was dropped, because "[the Daughter] would not disclose the sexual abuse information." Thus, the OCS had no evidence upon which to continue the investigation. Ms. Coleman further testified, however, that some time after the OCS investigation was closed, the Mother called her to relate that "[the Daughter] had confessed to her that there had been some sexual activity with the father."
According to Ms. Coleman's testimony, subsequent to the disclosure that the Daughter had made to her mother, the Mother called and related to Ms. Coleman what the Daughter had told Babysitter Two about a boy named Jared. Ms. Coleman met on an emergency basis with the Daughter, her mother, and Babysitter Two. After Babysitter Two told Ms. Coleman what the Daughter had told her about Jared, Babysitter Two asked the Daughter to confirm the information. The Daughter, however, said that she had forgotten what she had said about Jared.
Ms. Coleman testified that the Daughter "stood by my chair" after hearing what Babysitter Two had said. Ms. Coleman then took both of the Daughter's hands in hers, looked her in the eyes, told her that there was no boy named Jared and no tree house, and asked her what was happening. Ms. Coleman said that the Daughter became very serious and very still and then told Ms. Coleman that there was no Jared, that she had made up his name, but that "somebody did do all those things to me."
Ms. Coleman stated that what the Daughter had done was very typical of abused children. Abused children displace names and situations, and they "will substitute a name or make up a location, a tree house," because they do not want the real perpetrator to go to jail. Ms. Coleman said, "I think she was saying the absolute truth and [sic] she said, there is no Jared but someone did those things." The Daughter never revealed to Ms. Coleman who the abuser was.
Ms. Coleman opined that although she thought that the Daughter was sexually abused, she could not say who abused the Daughter. Finally, Ms. Coleman explained that she had not contacted the police or OCS regarding the possible sexual abuse of the Daughter, because the Mother had already contacted OCS.
Vivian McCollum, Ph.D.
Vivian McCollum, who was a licensed professional counselor with a doctorate in marriage and family therapy, testified at the earlier trial before Judge Irons, and her testimony was introduced into evidence *1032 at the trial before Judge Cates. Dr. McCollum had experience working with sexually abused children and had conducted workshops on counseling sexually abused children. The trial court accepted Dr. McCollum as an expert in the field of sexual abuse.
Dr. McCollum testified that she had counseled the Daughter, meeting with her approximately fifteen times. The Daughter was originally referred to Dr. McCollum by the Child Advocacy Center in New Orleans, which worked with sexually abused children. After the Daughter indicated to Dr. McCollum that she had been sexually abused by the Father, Dr. McCollum contacted OCS, and she was asked to make an incident report for OCS. Dr. McCollum reported to OCS that during a play therapy session, the Daughter revealed that the Father had hurt her. Dr. McCollum asked the Daughter to use a doll to demonstrate what she meant when she said that the Father had hurt her.
According to Dr. McCollum's testimony, the Daughter "took the doll and she used her index finger to indicate the vagina area and also the anal area." The Daughter said that the Father "used 2 fingers." Then the Daughter stated that "this was the last secret." When Dr. McCollum tried to ask the Daughter additional questions, she "ran into the bathroom and urinated on herself."
Dr. McCollum opined that the Daughter had experienced some type of sexual contact and that the contact was inappropriate. She also stated that she was not trying to elicit the information that the Daughter gave her when the Daughter voluntarily made the disclosure of sexual abuse. Dr. McCollum further explained that the Daughter said that the behavior that she reenacted during the play therapy session had originally occurred while she was asleep at the Father's house.
Ellie Wetsman, M.D.
Ellie Wetsman, M.D., a pediatrician who worked in the Children at Risk Evaluation Center at Children's Hospital in New Orleans, testified at the earlier trial before Judge Irons, and her testimony was introduced into evidence at the trial before Judge Cates. Dr. Wetsman was accepted as an expert in the field of pediatric medicine and in the diagnosis of child sexual abuse.
Dr. Wetsman explained to the trial court that the diagnosis of sexual abuse in a child is very difficult to make and that the diagnosis is usually made from a case history, because the physical examination is usually normal. Dr. Wetsman stated that there are a number of reasons that the examination may not indicate sexual abuse. One reason is "that this tissue that is known as a mucus membrane is a stretchy tissue," which is "meant to stretch, so that it will stretch without any breakage or scarring." Another reason is that the mucus membrane "has a rich blood supply which helps it to heal quickly." Dr. Wetsman also said that "if there is any kind of an injury, it will heal very quickly usually before I even have a chance to see the child." She further testified that a child could be penetrated with fingers without causing observable physical injury.
According to Dr. Wetsman, there are certain behaviors that can be corroborative of sexual abuse. For example, children may have nightmares or difficulty sleeping. They may be afraid of the dark or afraid to sleep alone. There may be sexual acting out, such as "undressing in public or trying to touch other children's genitals, dancing provocatively."
Dr. Wetsman further testified that most children the age of the Daughter "have what we call the delayed disclosure." The children only reveal information regarding *1033 sexual abuse well after it has occurred, because they might not know that what is happening to them is wrong, or because they are ashamed or afraid to reveal the abuse. Further, the perpetrator may threaten or bribe a child to prevent disclosure of the abuse. Disclosure occurs in "bits and pieces, they want to test the waters and . . . see how the person I disclose to is going to act." When the perpetrator is a family member, the child may be afraid that something "bad" might happen to the perpetrator if a disclosure is made.
When Dr. Wetsman was specifically testifying regarding the Daughter, she said that the Daughter was first referred to her by the emergency room at Children's Hospital and that the Daughter was again referred to her approximately six months later by the OCS. After Dr. Wetsman first saw the Daughter she reported the Daughter's case to the OCS.
According to Dr. Wetsman's testimony, the Daughter gave a history of the Father having spanked her. The Daughter also told Dr. Wetsman that "when it comes to my dad, he is mean; he touched me in the privates with his hand and with his finger and it hurt really bad." The Daughter also stated that the Father "hurts me in the privates." She further complained, however, that he liked to try to "pull my eyes out," something that the Father had obviously not succeeded in doing.
Dr. Wetsman opined in court that "based on the history that she has given me . . . I would lean toward the diagnosis of child abuse." Dr. Wetsman also stated that "it is more likely that she has been [abused] than she hasn't." Based solely on her physical findings with respect to the Daughter, however, Dr. Wetsman could neither confirm nor deny that there had been abuse.
Viola Vaughan-Eden, Ph.D.
Viola Vaughan-Eden, a clinical social worker licensed in the State of Virginia, testified at the trial before Judge Cates. Dr. Vaughan-Eden earned a Ph.D. in social work, and she had worked at Children's Hospital in Norfolk, Virginia with approximately a thousand children who were abused or had been suspected of having been abused. She also treated sexually abused children in her own private practice. Dr. Vaughan-Eden was a frequent presenter at conferences related to sexually abused children. She was recognized by the trial court as an expert in the field of clinical social work and as an expert in the diagnosis and treatment of child sexual abuse.
Dr. Vaughan-Eden testified that in determining whether a child four to five years old has been abused, she gathers an "in-depth social history from caregivers . . . determining whether or not there's particular sexualized behaviors that are exhibited." She also considers the statements that the child has made, and she normally interviews the child.
Dr. Vaughan-Eden further testified that disclosure of sexual abuse is a process and that "one well-noted study indicates that the first time children are asked about sexual abuse, 72 percent of them deny their abuse." Also, children generally do not make the disclosure of sexual abuse to strangers. Often younger children make the disclosure inadvertently through something that they have said, or people may become suspicious of their behavior, "because they don't have the impulse control to not sexually act out themselves if they have indeed been perpetrated on." There is a lot of sexualized behavior observed in sexually abused children.
According to Dr. Vaughan-Eden's testimony, children disclose sexual abuse "in a piecemeal fashion." The children make *1034 the disclosure in this fashion so that they can test the reaction of the person to whom they make the disclosure. Disclosure is often thwarted by perpetrators who threaten the child or insist that the abusive activities be kept secret by the child. The perpetrator might also tell the child that he will go to jail if the child discloses the abuse. Dr. Vaughan-Eden further stated that a child generally loves a parent who is abusing the child, and she said that there is "conflict where they're torn between the fun, the positive, and the love and wanting that to be all the time versus the times, the secret times in which they get hurt."
In preparation for testifying in the instant case, Dr. Vaughan-Eden reviewed the transcripts of the hearing before Judge Irons, the deposition of Babysitter One, the medical records of Dr. Wetsman, a letter from Ms. Coleman to the Daughter's pediatrician, and a custody evaluation that had been completed in connection with an earlier custody proceeding in the case. Dr. Vaughan-Eden testified that she conducted telephone interviews with Babysitter One, Babysitter Two, and a third person who had babysat with the Daughter. Finally, Dr. Vaughan-Eden contacted the Father's sister, G.S., and Dr. Vaughan-Eden had a brief meeting with the Daughter.
When asked whether she had formed an opinion regarding whether the Daughter had been sexually abused, Dr. Vaughan-Eden testified that "I have very serious concerns that . . . [the Daughter] has experienced sexual abuse." When asked whether she had formed an opinion regarding who had sexually abused the Daughter, Dr. Vaughan-Eden replied that "[a]ccording to everything I reviewed and everyone that I've interviewed, the primary suspect is her father." Dr. Vaughan-Eden said that "seven different people have stated to me that she has disclosed in some fashion, naming her father as having some type of inappropriate contact sexually with her."
According to Dr. Vaughan-Eden's testimony, the evidence that the Daughter had been sexually abused consisted of her sexual comments, her sexualized behavior, her attempts to insert objects into her vagina, her simulation of male masturbation, her conversations regarding digital penetration of the anus and vagina, her demonstration of sexual conduct on dolls, and her revelation that she was told to keep sexual contact and behaviors secret. Dr. Vaughan-Eden stated that "the list of sexual activities of this young girl seemingly is endless," that "[s]he has acted out sexually with other children on several different occasions," and that she "attempted to fondle adult females." The possible analogy of male ejaculation to juice squirting from a hot dog "in and of itself alarmed" Dr. Vaughan-Eden.
Dr. Vaughan-Eden also found "very alarming" the Daughter's revelation that the Father had penetrated her with his fingers. After the revelation, the Daughter had proceeded to urinate on herself. Dr. Vaughan-Eden testified that the Daughter's behavior indicated that she suffered from post-traumatic stress disorder, and Dr. Vaughan-Eden further opined that some of the "hyperactive or silly or anxious" behavior attributed to the Daughter was "clearly trauma." Urinating on herself "just speaks to the level of stress that she's currently under."
Dr. Vaughan-Eden was questioned regarding her interview with the Daughter, and she said, "Essentially I did not interview . . . [the Daughter]." Instead she observed her by having breakfast with her, because "the research indicates repeated interviewing of children who are suspected of any kind of abuse is detrimental to *1035 them." Therefore, Dr. Vaughan-Eden did not think it would be appropriate for her to interview the Daughter.
Testimony of OCS Employee
Annette Snyder testified at the hearing before Judge Cates. She testified that her job was to "conduct initial investigation into allegations of neglect and abuse" for OCS. Ms. Snyder was involved in the second investigation that was conducted by OCS regarding the Daughter. Ms. Snyder said that the investigation of the alleged abuse perpetrated on the Daughter was only the second investigation that she had conducted with respect to sexual abuse allegations. Therefore, her supervisor closely supervised her during the entire course of her investigation.
Ms. Snyder testified that she had interviewed both the Mother and the Daughter. Additionally, an audiotape had been made of an interview of the Daughter that was conducted at the Child Advocacy Center. Ms. Snyder was present during that interview. Further, Ms. Snyder reviewed the information gleaned from the first investigation that OCS had conducted in connection with allegations of sexual abuse regarding the Daughter. Also, during her investigation, Ms. Snyder contacted the Father, the Father's girlfriend, and Dr. McCollum, and she reviewed the medical report from Children's Hospital in New Orleans and a report prepared by Dr. McCollum. The audiotape of the interview with the Daughter was played at the trial.
Ms. Snyder testified that the investigation that she conducted was thorough and that the allegations of sexual abuse were found to be invalid by the OCS. Ms. Snyder said that the invalidity finding was made, "[b]ecause basically, according to . . . [the Daughter], . . . she was asleep when the alleged incident occurred [a]nd . . . [the Father's girlfriend] told her what happened." Also, there was no physical evidence of abuse. Ms. Snyder further elaborated by saying that during an interview with the Daughter, the Daughter "proceeded to demonstrate on a doll, intensively punching the doll in the face, the stuffed animal in the face." Then, according to Ms. Snyder, "she [the Daughter] flipped the doll over and intensively poked the dog [sic] in the anus as well as in the vaginal area." Ms. Snyder said that the Daughter stated that "her father poked her there too," but the Daughter said that "she had her clothes on" when that happened.
Ms. Snyder admitted that she had never read a book about child sexual abuse. Ms. Snyder further admitted that she did not write on the interview sheet that she prepared in connection with her interview of the Daughter that the Daughter had said that the Father's girlfriend was the one who had told her what her Father had done to her, because she had been asleep. Nevertheless, Ms. Snyder testified that "she definitely told me that."
Testimony of the Father's Friends and Relatives
D.M.S.
D.M.S. testified that he had known the Father for approximately fifteen or sixteen years and that they were very good friends. D.M.S. also stated that he had known the Daughter since she was born.
D.M.S. had a daughter who was younger than the Daughter, and his daughter ("Playmate Two") and another child, who was the daughter of a mutual friend of D.M.S. and the Father, frequently played with the Daughter when she visited the Father. All three girls saw each other almost every other weekend when the Daughter was visiting the Father on a regular basis. On those weekends, D.M.S., his wife, the mutual friend, and their daughters would all spend the day at *1036 the Father's house. The adults visited with each other while the children played.
D.M.S. testified that except for one incident he observed no unusual behavior regarding the Daughter. On one occasion, however, when the Father and D.M.S. were in the den of the Father's home watching television, the Daughter and Playmate Two emerged from the bedroom where they had been playing, and Playmate Two was crying. D.M.S. testified that Playmate Two had been "poked . . . with a crayon" and that she had nothing on but a shirt. The Father spanked the Daughter for hurting Playmate Two.
D.M.S. was asked whether he would allow the Father to have "unfettered access" to his daughter, Playmate Two, if he were told that four experts had testified under oath that they believed that the Father had sexually abused the Daughter. D.M.S. said that he would allow the Father to have such access. D.M.S. also testified that "I'd be very surprised if, if it [the allegation of sexual abuse] was true."
E.B.
E.B. testified that she had known the Father for more than twenty years. She said that she considered the Father to be her best friend and that her daughter ("Playmate Three") considered the Daughter to be one of her best friends. E.B. testified that the Daughter, Playmate Two, and Playmate Three were very close friends and that they played together at the Father's house on the weekends when the Daughter was visiting the Father. E.B. also stated that she had left her daughter, Playmate Three, alone with the Father and that she had never been concerned about doing so. E.B. further testified that even if four experts had attempted to implicate the Father in the sexual abuse of the Daughter, E.B. still had no concern at all about leaving her daughter alone with the Father.
E.B. was asked whether she had seen any changes in the Daughter's behavior during the past two years, and she stated that she had not. She thought that Playmate Two, Playmate Three, and the Daughter were all normal children, and she had not observed any mean or aggressive behavior when they were together.
When E.B. was asked whether the accusations against the Father would cause her to be concerned about allowing the Father to babysit with her own daughter, E.B. stated that she would not be concerned. E.B. expressed no hesitation whatsoever about allowing Playmate Three to be alone with the Father.
R.S.
R.S. was the wife of D.M.S. and the mother of Playmate Two. She said that she considered the Father to be like a brother to her and that the Daughter was like a niece to her. R.S. also explained that her daughter, Playmate Two, the Daughter, and Playmate Three often played together when the Daughter was visiting the Father. She further stated that although she was aware that four experts had testified regarding allegations of sexual abuse against the Father, she still would permit Playmate Two to be alone with the Father. The Father babysat with Playmate Two on occasion, and R.S. had had absolutely no concerns about it.
R.S. also stated that she had no concerns about abnormal behavior on the part of Playmate Two, Playmate Three, or the Daughter. She was, however, aware of an incident involving a crayon during which the Daughter had "poked . . . [Playmate Two] in the vagina with a crayon." R.S. stated that her daughter, Playmate Two, said that she and the Daughter were playing "Mommy and Baby." The Daughter was allegedly changing Playmate Two's diaper as part of the game that they were *1037 playing. R.S. said, "And she coloredShe had the crayon. She was gonna color the vagina and hurt . . . [Playmate Two]. And . . . [Playmate Two] ran out of the room screaming." R.S. said that the Father and her husband, D.M.S., had handled the situation.
R.S. testified that at first she was concerned about the incident involving the crayon, but once she learned that the Daughter was "just coloring on the outside of the vagina" and had not "actually inserted the crayon into . . . [Playmate Two's] vagina," she was not concerned. R.S. also testified that the Father was very upset about the incident involving the crayon, because "he was concerned that somebody might have been fooling around with . . . [the Daughter]." Finally, R.S. said that she had not observed any changes in the Daughter's behavior after the incident involving the crayon.
J.E.S.
J.E.S., the Father's father, testified at the trial. He testified that the Father had been a good father to the Daughter. He stated that he had seen the Father give the Daughter piggyback rides and that he had no concern about his other grandchildren being around his son. J.E.S. did not consider his son to be a threat to any child.
J.S.,
J.S., the Father's uncle, testified that he had seen the Father and the Daughter together many times, and he described their relationship as very loving. He had never seen the Daughter exhibit any abnormal behavior, and he stated that the Daughter was not an aggressive child
G.S.
G.S., the Father's sister, testified that the Father had made a loan in her name unbeknownst to her and without her consent. She did not learn about the loan until it appeared on her credit report.
Testimony of the Father and the Mother
G.J.S.
G.J.S., the Father, testified at the trial. He testified that he had "[a]bsolutely not" ever touched the Daughter in the ways that were being described at the trial. When asked about the incident involving Playmate Two and the crayon, the Father said that he had spanked the Daughter, not because of what she did with the crayon, but because the Daughter lied about the incident. Rather than admitting her guilt, the Daughter had allegedly claimed that Playmate Three, who was not even present at the time, or Playmate Two had instigated the incident. The Father also admitted that the Daughter had contracted a molluscum[3] infection on her face, but he categorically denied that he had ever had molluscum on his penis, despite the fact that the Mother had said that he had told her that he had a molluscum infection on his penis.
The Father was questioned about the documents that he allegedly forged to obtain a student loan in his sister's name. He denied forging his sister's name and claimed that his sister had given him permission to sign her name on the loan documents.
When he was asked whether he had noticed any changes in the Daughter's behavior after the incident involving a crayon, he replied, "Absolutely not." He also said that she was "[a]bsolutely not" an aggressive child and that she had not engaged in any provocative behavior around him.
The Father testified that he and the Mother had been involved in protracted *1038 litigation for several years. He said that he believed that the Mother wanted to move out of state with the Daughter so that the Mother could be with her fiancé. Additionally, the Father testified that he was concerned about the possibility that the Daughter had been sexually abused, but he also said, "I don't think my daughter was molested." He stated, "I believe that y'all hired experts to fabricate stuff. . . ."
C.L.S.
C.L.S., the Mother, testified at both the trial before Judge Irons and the trial before Judge Cates. At the trial before Judge Irons, the Mother testified regarding the custody arrangements for the Daughter. She also testified that she started to be concerned about the possibility that the Daughter might be abused by the Father because of things other people had told her.
After the Mother was alerted to the possible abuse of her daughter, she contacted the Daughter's pediatrician. As a result of the Mother's conversation with the pediatrician, she took the Daughter to the emergency room at Children's Hospital. The Daughter was examined in the emergency room and was referred to Dr. Wetsman for further evaluation.
The Mother was asked whether she had ever observed anything unusual about the Daughter when the Daughter returned home from her visits with the Father. The Mother said, "Yes, on numerous occasions in the past since she was, I guess 2 or even earlier, there would be occasions when she would return back from visitation where she was excoriated in her perineal area, her vaginal area and her anal area." The Mother said that she attributed the irritation to the fact that "her father just wasn't wiping her properly and wasn't putting diaper cream on her and things like that." Even after the Daughter was no longer wearing diapers, however, she still occasionally returned home with the same type of irritation after visiting her Father.
The Mother was also asked whether the Daughter had toileting accidents after she was toilet trained. The Mother explained that during her first grade year, the Daughter had experienced soiling and wetting accidents at school. This was a new type of behavior that the Daughter was exhibiting, because she had been successfully toilet trained when she was two years old.
When the Mother was questioned regarding the Daughter's molluscum infection, the Mother testified that the Daughter had been diagnosed with molluscum. She further testified that she had spoken to the Father about the molluscum infection on several occasions. She said, "In fact, . . . [the Father] called me . . . to tell me that he had molluscum on his penis." According to the Mother's testimony, she initially thought that the Daughter had contracted the molluscum infection on her face as a result of the Father not washing his hands properly.
At the trial before Judge Irons, the Mother testified that she had observed behavioral changes in the Daughter in addition to the toileting problems. The Mother stated that the Daughter had exhibited aggressive behavior, had begun having nightmares, and had become concerned about the Mother's safety.
The Mother additionally testified that the Daughter made direct statements to her regarding the Father's abuse. The Mother said that the Daughter had used a doll to demonstrate what her Father had done to her. The Mother stated that the Daughter indicated that the Father "[p]okes her in between the legs in her privates." The day after this information *1039 was imparted by the Daughter to the Mother, the Mother contacted the Daughter's pediatrician, who referred the Daughter to Children's Hospital in New Orleans.
During the course of her testimony at the trial before Judge Irons, the Mother testified regarding the incident between the Daughter and Playmate Two involving a crayon. The Mother explained that the Father called her to tell her that he had just "smacked" the Daughter. The Father had walked into the room where the Daughter and Playmate Two were playing. Playmate Two was naked, and "our daughter was putting a crayon into . . . [Playmate Two's] vagina." The Mother testified that she was concerned about the incident and the fact that the Daughter had been "smacked."
The Mother was also asked whether she had considered that her fiancé might have sexually abused the Daughter. The Mother testified that she had certainly considered that possibility, but she had dismissed it, because her fiancé had spent very little time alone with the Daughter. Once the Daughter had stayed alone with the fiancé while the Mother had gone to the drugstore. Additionally, the Daughter specifically stated that it was not the fiancé who had abused her when the Mother had asked the Daughter about the possibility of the fiancé perpetrating the abuse.
When the Mother testified at the trial before Judge Cates, she stated that the Daughter had talked to the Father on the telephone after he had been prohibited from seeing her. After the telephone calls with the Father, the Daughter frequently urinated on herself. After one particular telephone call in which the Father had told her that nobody could stop him from seeing her, "she went into the bathroom and urinated all over herself, and I found her saturated in urine in the bathroom, standing there."
The Mother further testified that the Daughter had played roughly with her friends. She also said that the Daughter had pulled down other children's pants on the playground.
Trial Court Judgment
After the trial before Judge Cates was completed, he rendered a judgment granting the petition for protection filed by the Mother and ordered that a Louisiana Uniform Abuse Prevention Order of Protection be issued to suspend all further contact between the Father and the Daughter and to require the Father to attend and successfully complete a qualified treatment program designed for sexual abusers prior to any modification of the terms of the protective order. The Mother was awarded sole custody of the Daughter. The judgment also denied the motions and rules that had been filed by the Father.

DISCUSSION
Standard of Review
In child custody cases, appellate courts will not disturb an award of custody absent a manifest abuse of discretion in the trial court. See Revision Comments 1993 to La. Civil Code art. 134, Comment (b). In Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), the Louisiana Supreme Court described the appellate review standard by stating that "upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse." Id. at 1196. See also AEB v. JBE, 99-2668, p. 7 (La.11/30/99), 752 So.2d 756, 761; Falcon v. Falcon, 05-0804, p. 3 (La.App. 4 Cir. 3/29/06), 929 So.2d 219, 222.
Post-Separation Family Violence Relief Act, La. R.S. 9:361 et. seq.
The Violence Relief Act provides protection for children from family violence, including *1040 sexual abuse. The Violence Relief Act specifically addresses the problem of sexual abuse as follows in La. R.S. 9:364(D):
If any court finds, by clear and convincing evidence, that a parent has sexually abused his or her child or children, the court shall prohibit all visitation and contact between the abusive parent and the children, until such time, following a contradictory hearing, that the court finds, by a preponderance of the evidence, that the abusive parent has successfully completed a treatment program designed for such sexual abusers, and that supervised visitation is in the children's best interest.
Thus, the burden of proof in cases involving family violence in the form of sexual abuse is by clear and convincing evidence.
In Chatelain v. State, Department of Transportation and Development, 586 So.2d 1373 (La.1991), the Louisiana Supreme Court discussed the requisites for satisfying the burden of proof by clear and convincing evidence. The Supreme Court stated:
The burden of proof by clear and convincing evidence requires a party to persuade the trier of fact that the fact or causation sought to be proved is highly probable, i.e. much more probable than its non-existence. This burden is an intermediate one between the burden of proof by a preponderance of the evidence and the burden of proof beyond a reasonable doubt. The requirement of proof by clear and convincing evidence has traditionally been applied in cases in which there is a special danger of deception or in which the particular type of claim is disfavored on policy grounds.
586 So.2d at 1378 (citations omitted.)
This Court has also considered the issue of what constitutes "clear and convincing evidence." In Succession of Dowling, 93-1902 (La.App. 4 Cir. 2/25/94), 633 So.2d 846, 855, this Court stated that "[t]o prove a matter by `clear and convincing' evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence." See also Black's Law Dictionary 596 (8th ed. 2004), which defines "clear and convincing evidence" as "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain."
Although the burden of proof in a case involving the Violence Relief Act is higher than in most civil cases, the evidentiary standard for admissible testimony is lessened. As explained in Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040, the focus of the Violence Relief Act is "not the innocence or guilt of the parent, but the best interest and custody of the child." 98-1976, p. 10, 738 So.2d at 1046. Additionally, "[b]ecause of the harsh result of a judge's finding of abuse, the Legislature raised the standard of proving the abuse from the ordinary `preponderance' standard to `clear and convincing.'" 98-1976, p. 11, 738 So.2d at 1046.
In the Folse case, the Louisiana Supreme Court also discussed the need to relax the evidentiary standard in cases involving the Violence Relief Act. The Supreme Court stated:
It is well known and documented that sexual abuse of children is extremely difficult to detect because "the offense often takes place in secret, the victim is young, vulnerable, and reluctant to testify, and there is often no physical or other evidence the abuse took place." State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, 962. The evidence is rarely direct, but is circumstantial. . . . Thus, the purposes of unearthing the truth under the difficult circumstances of child sexual abuse would be served by permitting a judge to use the rules of evidence as guides rather than blinders because *1041 the relaxed standard is responsive to the circumstances in which child abuse occurs and is exposed.
98-1976, p. 13, 738 So.2d at 1047. The Supreme Court further stated that La. C.E. art. 1101(B) provides for a relaxed evidentiary standard to be applied in child custody proceedings to promote the purposes of those proceedings. 98-1976, p. 11, 738 So.2d at 1046.
La. C.E. art. 1101(B) provides that in certain proceedings, the principles underlying the Code of Evidence "shall serve as guides to the admissibility of evidence." Article 1101(B) further provides that in certain types of cases, which include child custody cases, "[t]he specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding."
In the Folse case, the Supreme Court found that the provisions of La. C.E. art. 1101(B) were applicable to cases governed by the provisions of the Violence Relief Act, and the Supreme Court held that hearsay evidence, which would have otherwise been inadmissible evidence, was admissible in a case brought under the Violence Relief Act. 98-1976, pp. 12-13, 738 So.2d at 1047-48. Thus, hearsay that would otherwise be inadmissible could properly be admitted in the instant case.
Assignments of Error
Assignment of Error No. 1: The trial court erred in terminating the Father's parental rights by holding that "clear and convincing" evidence was presented to determine that the minor child suffered sexual abuse and that the Father was the perpetrator of that abuse.
The Mother had the burden of proof in the instant case. She was required to prove that the Daughter was subjected to sexual abuse and that the Father was the perpetrator of the abuse. To meet her burden of proof the Mother was required to provide proof by clear and convincing evidence.
Based on the record before us, we find that the Mother met her burden of proof. Four expert witnesses[4] testified that in their opinion, the Daughter had or very likely had suffered from sexual abuse. Also, the Daughter disclosed the abuse to her Mother, to Babysitter Two, and to two of the expert witnesses, Dr. McCollum and Ms. Coleman. According to the expert witness testimony, the Daughter's sexualized behavior also clearly indicated that she had been sexually abused.
Although the OCS investigation did not result in a determination that the Daughter had been abused, the Daughter, in fact, did disclose to the OCS investigator that she had been abused by the Father. Ms. Snyder, who conducted the investigation, testified that the reasons that the allegations of abuse were deemed to be invalid were that there was no physical evidence of abuse and that according to the disclosure made by the Daughter, the abuse occurred while she was asleep.
We also find that the lack of physical evidence in no way means that the Daughter did not suffer sexual abuse. Dr. Wetsman explained that in most cases of sexual abuse of a child, there is no physical evidence of the abuse due primarily to the ability of the tissues normally affected by the abuse to stretch easily and to heal so quickly that there is no physical evidence of the abuse by the time a child is examined *1042 by a physician. With respect to the Daughter's claim that the abuse occurred while she was asleep, the expert testimony of both Dr. Wetsman and Dr. Vaughan-Eden reflects that children the age of the Daughter do not disclose sexual abuse in a straightforward manner. Additionally, the testimony of Ms. Coleman shows that sexually abused children tend to displace names and situations; hence the fact that the Daughter disclosed to the OCS that she was sexually abused while she was asleep in no way means that she was not being truthful about the abuse.
Some of the strongest evidence that the Daughter was sexually abused was the testimony regarding the sexualized behavior that was exhibited by this young child. It would have been almost impossible for the Daughter at her tender age to simulate male masturbation and to describe ejaculation in the way that she did without her having been exposed to sexual abuse. Additionally, the Daughter's behavior, according to Dr. Vaughan-Eden, showed that she was suffering from extreme stress. Also, her behavior included many of the known symptoms of child sexual abuse.
Based on the record before us, particularly the expert testimony, we think that the Mother has clearly carried her burden of proof in showing that the Daughter was sexually abused. We find that it is much more probable than not that such abuse did take place.
The Mother's burden of proof in showing that the Father was the perpetrator of the sexual abuse of the Daughter was also met. There was no evidence whatsoever, other than the testimony that the Mother had left the Daughter alone with her fiancé while she went to the drugstore on one occasion, that the Daughter had been alone with any male other than the Father during the time that the sexual abuse had allegedly occurred. There was abundant testimony that the Daughter had disclosed to a number of people that the Father had sexually abused her, and the only evidence that the Father presented to rebut the testimony that the Daughter had been abused by him was his own testimony. The Father testified that he absolutely did not sexually abuse his daughter in any way and that he did not believe that the Daughter had been abused. He believed that the expert witnesses were part of a conspiracy to deprive him of his daughter so that the Mother could move out of state to be with her fiancé.
We find that the evidence meets the clear and convincing standard for the burden of proof in cases governed by the Violence Relief Act. Based on the foregoing discussion, we find that the Mother carried her burden of proof regarding both the existence of the sexual abuse perpetrated against the Daughter and the identity of the Father as the perpetrator of the abuse. Therefore, this assignment of error is without merit.
Assignment of Error No. 2: The trial court erred in denying the Motion for Expedited Hearing to Appoint Guardian Ad Litem, for Appointment of Independent Child Psychologist and for Review of Original Trial Transcript that was filed by the Father.
After the trial before Judge Irons, the Father filed a pleading entitled, "Motion for Expedited Hearing to Appoint Guardian Ad Litem, for Appointment of Independent Child Psychologist and for Review of Original Transcript." In this pleading the Father moved (1) to have Judge Cates review the transcript of the trial before Judge Irons and all OCS records involved in that trial prior to his hearing the instant case, (2) to have an independent psychologist appointed for the Daughter, and (3) to have an attorney appointed to represent the Daughter.
*1043 With respect to the motion to have Judge Cates review the transcript of the trial held before Judge Irons and the OCS records, the transcript and the OCS records were introduced as evidence in the trial before Judge Cates. Therefore, they were available for his consideration in reaching the judgment that he rendered. Thus, this aspect of this assignment of error is moot.
After the trial was over, the Father filed a motion for a new trial, and he raised the failure of the trial court to appoint an independent psychologist to examine the Daughter as a basis for granting a new trial. La. R.S. 9:331(A) provides in relevant part that "[t]he court may order an evaluation of . . . the child in a custody or visitation proceeding for good cause shown." (Emphasis added.) The evaluation is to be made by a mental health professional selected by the parties or by the court. Id. Also, La. R.S. 9:331(B) provides in relevant part that "[t]he court may order . . . the child to submit to and cooperate in the evaluation, testing, or interview by the mental health professional." (Emphasis added.)
In the instant case, Judge Cates denied the motion for a new trial, and, based on the applicable statutory language, it was in his discretion to appoint or not appoint an independent child psychologist to examine the Daughter. In his reasons for the judgment denying the new trial, he stated that the trial court heard the testimony of four experts, only one of which "appeared to have been `hired' by . . . [the Mother] for purposes of the trial of this matter." The trial court further stated:
There was no evidence presented either at the time of consideration of . . . [the Father's] Motion for Appointment of Independent Child Psychologist or at the hearing on the Motion for New Trial that the three experts, Brenda Coleman, Dr. Ellie Wetsman, and Dr. Vivian McCollum were anything but independent in their evaluations of the child and testimony at trial.
We do not find that the trial court judge abused his discretion in denying the Father the opportunity to have an independent child psychologist examine the Daughter. Thus, this assignment of error, insofar as it pertains to the appointment of an independent child psychologist, is without merit.
Although in his motion for a new trial the Father did not raise the failure of the trial court to appoint an attorney to represent the Daughter, we note that La. R.S. 9:345(A) provides in relevant part that "[i]n any child custody case . . . the court, upon its own motion, upon motion of any parent . . . may appoint an attorney to represent the child if, after a contradictory hearing the court determines such appointment would be in the best interest of the child." (Emphasis added.) La. R.S. 9:345(A) further lists the factors that a court must consider in determining whether it is in a child's best interest to have an attorney appointed. The Father's motion for the appointment of an attorney to represent the Daughter was denied by the trial court judge.
La. R.S. 9:345(B), (D), and (E), however, provide:
B. The court shall appoint an attorney to represent the child if, in the contradictory hearing, any party presents a prima facie case that a parent or other person caring for the child has sexually, physically, or emotionally abused the child or knew or should have known that the child was being abused.
. . . .
D. Upon appointment as attorney for the child, the attorney shall interview the child, review all relevant records, *1044 and conduct discovery as deemed necessary to ascertain facts relevant to the child's custody or visitation.
E. The appointed attorney shall have the right to make any motion and participate in the custody or visitation hearing to the same extent as authorized for either parent.
(Emphasis added.)
Although the attorney should have been appointed for the Daughter as soon as a prima facie case of the sexual abuse in this case had been presented, that was not done. We find that the trial court's failure to appoint an attorney to represent the Daughter was an error, but it was a harmless error. In this case, there was overwhelming evidence that the Daughter had been abused by the Father, and the evidence also made it clear that further interviews of the Daughter regarding the abuse would be detrimental to her. Clearly, the best interest of the Daughter would not be served by appointing an attorney who would be required by La. R.S. 9:345(D) to interview her now. It is clear from the Louisiana Civil Code articles concerning child custody that the best interest of the child is paramount in all child custody cases. La. Civil Code arts. 131-37.
We also note that in Marks v. New Orleans Police Department, 06-0575 (La.11/29/06), 943 So.2d 1028, the Louisiana Supreme Court discussed the nature of a statutory mandate that does not provide a penalty for non-compliance with the mandate. In the Marks case the issue was the effect of the failure of the police department to comply with a statutory sixty-day time period for conducting an investigation of a law enforcement officer. The statute provided that the investigation of a law enforcement officer "shall be completed within sixty days." 06-0575, p. 3 n. 1, 943 So.2d at 1031 n. 1.
After reviewing the statute, the Supreme Court found that "the fact that the legislature did not include a penalty in the statute for non-compliance with the sixty-day period to be more significant" than whether the statute required a mandatory or directory interpretation. 06-0575, p. 10, 943 So.2d at 1035. The Supreme Court concluded that "[c]ertainly, the statute does not provide, nor suggest, that the remedy for non-compliance with the sixty-day period is dismissal of the disciplinary action." Id.
The Supreme Court in Marks additionally stated:
"Generally, statutes using mandatory language prescribe the result to follow (a penalty) if the required action is not taken. If the terms of the statute are limited to what is required to be done, i.e., procedural rules, then the statute is considered directory even though mandatory language is employed."
Id. Finally, the Supreme Court quoted Carter v. Duhe, 05-3090, p. 10 (La.1/19/06), 921 So.2d 963, 970, in affirming that "it is not the function of the judicial branch in a civilian legal system to legislate by inserting penalty provisions into statutes where the legislature has chosen not to do so." 06-0575, p. 11, 943 So.2d at 1035.
In the instant case, La. R.S. 9:345(B) is analogous to the statute in the Marks case in that no remedy is provided for a case where an attorney should have been, but was not, appointed to represent a child. Therefore, there is no mandate that the trial court judgment be reversed or vacated.
Based on the foregoing, we find that it is not in the Daughter's best interest to have an attorney appointed to represent her at this stage in the proceedings and that La. R.S. 9:345(B) contains no statutory remedy for the failure of the trial court to appoint an attorney to represent the Daughter. *1045 Therefore, we find that the assignment of error relating to this issue has merit, because it was error on the part of the trial court not to have appointed an attorney to represent the Daughter. Nevertheless, the error was harmless, and we will not reverse or remand this case because of the error.
Assignment of Error No. 3: The trial court was in error in granting the Mother sole custody of the minor child.
Because we have determined that the trial court judge did not abuse his discretion in finding that the Mother proved by clear and convincing evidence that the Daughter had been sexually abused by the Father, we find that the trial court was required pursuant to the Violence Relief Act to prohibit all contact between the Father and the Daughter. According to the express provisions of the Violence Relief Act, only after the Father has successfully completed a treatment program designed for sexual abusers may supervised visitation with the Daughter resume. Additionally, such visitation may only resume after a contradictory hearing and a finding by the trial court that the visitation is in the best interest of the Daughter. This assignment of error is without merit.
Assignment of Error No. 4: The trial court was in error in denying the Rules to Change Custody and for Contempt filed by the Father.
We find that not only was there no abuse of discretion on the part of the trial judge in denying these rules, we also find that the trial court judge was statutorily required by the Violence Relief Act to deny the rule to change custody. This assignment of error is without merit.

CONCLUSION
For the reasons set forth in this opinion, we find that the judgment of the trial court awarding sole custody to the Mother was correct. We hereby affirm the judgment of the trial court.
AFFIRMED.
GORBATY, J., dissents with reasons.
GORBATY, J., dissenting.
I respectfully dissent. La. R.S. 9:345(B) provides:
The court shall appoint an attorney to represent the child if, in the contradictory hearing, any party presents a prima facie case that a parent or other person caring for the child has sexually, physically, or emotionally abused the child or knew or should have known that the child was being abused.
A prima facie case that the father was sexually abusing the daughter was made. Because the language of La. R.S. 9:345(B) is mandatory, an attorney should have been appointed to represent the daughter. As such, the trial court erred in denying the father's motion to have an attorney appointed for the daughter. The majority reasons that once an attorney is appointed for the daughter, she will have the opportunity to file a motion for a new trial. I disagree that this potential remedy provides a cure. Further, this failure to comply with a mandatory statutory requirement cannot be overlooked in the interest of judicial economy. Since the mandatory language was ignored, and no attorney was appointed, the entire judgment should be vacated, and this matter should be remanded for a new trial.
Marks v. New Orleans Police Department, 06-0575 (La.11/29/06), 943 So.2d 1028, relied upon by the majority, is inapplicable to the case at hand. In Marks, a police officer accused of misconduct was terminated by the police department beyond the sixty-day statutory period for conducting an investigation. The Louisiana *1046 Supreme Court held that the statute did not establish a penalty for noncompliance, and the court could not supply one by dismissing the disciplinary action. In the instant case, I would not dismiss the suit, but rather would vacate the judgment and remand it for a new trial to be conducted, with an attorney appointed to represent the minor child. Reversal, remand, and vacation of judgments are functions of the judicial branch and well within this court's power. These actions do not constitute an attempt to "legislate by inserting penalty provisions into statutes where the legislature has chosen not to do so," 06-0575, p. 11, 943 So.2d at 1035, as the Louisiana Supreme Court ruled had occurred in Marks. Accordingly, for these reasons, I would vacate the judgment and remand this matter for a new trial, without reaching a decision on the other issues presented in the appeal.
NOTES
[1] Except in the case of expert witnesses and the state agency employee who handled the investigation of the sexual abuse allegedly perpetrated on the Daughter, initials rather than names are used throughout this opinion to protect the privacy of the child and other parties involved in this matter.
[2] Babysitter Two also said that she had met with Dr. Vivian McCollum, another of the Daughter's therapists.
[3] Molluscum contagiosum is a common skin disease caused by a virus that affects the top layers of the skin. The infection is spread by skin contact.
[4] Three of the expert witnesses were selected to treat the Daughter for symptoms of sexual abuse, and only one expert witness, Dr. Vaughan-Eden, was acting solely in the capacity of an expert witness on behalf of the Mother.